# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 583 |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Kimberly Howard, has filed a motion seeking reversal of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Sections 216(i) and 223(d) of the Social Security Act (doc. # 19). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (doc. # 27). For the following reasons, Ms. Howard's motion is granted, and the Commissioner's motion is denied.

## I.

Ms. Howard applied for DIB and SSI on May 15, 2013, alleging that she became disabled on March 25, 2013 (R. 210, 217). Her last insured date is December 31, 2018 (R. 23). The application was initially denied on September 26, 2013, and upon reconsideration on May 6, 2014 (R. 108, 147-49). Ms. Howard, represented by counsel, appeared and testified before an administrative law judge ("ALJ") on February 9, 2015 (R. 40-94). No medical expert was present, but a vocational expert ("VE") testified (R. 86-92). On May 22, 2015, the ALJ issued a decision

---

[1] On February 22, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 5).

finding that Ms. Howard was not disabled and denying her claim for benefits (R. 23-36). The Appeals Council denied Ms. Howard's request for review on November 28, 2016, making the ALJ's decision the final decision of the Commissioner (R. 1-7). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. As the ALJ noted, Ms. Howard claims that she suffers from multiple physical and mental impairments (R. 33).[2] The ALJ's decision primarily addresses pain that stems from vasculitis, Ms. Howard's joints, and problems with her cervical spine (R. 33-36). Because Ms. Howard does not argue that the ALJ erred in focusing on these impairments, we limit our review of the lengthy record in this case to those portions that are relevant to the ALJ's decision. Part A reviews that medical history; Part B addresses the hearing testimony and written statements submitted by Ms. Howard and her husband; and Part C summarizes the ALJ's opinion.

## A.

Ms. Howard was born on August 3, 1966 and was forty-eight years old at the time of the hearing (R. 51). She did not complete high school but later obtained a GED (R. 55). Ms. Howard's past work was primarily as a Medicare billing clerk for health care providers such as hospitals (R. 55-56).

During 2012, Ms. Howard sought treatment for skin rashes and pain with rheumatologist, Dr. Brinda Joshi, and then, starting on September 20, 2012, with Dr. Nicole Richman for her primary impairments of vasculitis, inflammatory arthritis, and neck pain (R. 524). Dr. Richman

---

[2] The ALJ addressed Ms. Howard's claims related to her cervical spine, vasculitis, a myocardial infarction, coronary artery disease, nephrotic syndrome, diabetes and diabetic neuropathy, obesity, hypertension, elevated cholesterol, depression, anxiety, attention-deficit hyperactivity disorder, post-traumatic stress disorder, and inflammatory arthritis (R. 25-28).

noted that Ms. Howard had experienced pain in her joints that had not improved even with increased dosages of methotrexate (*Id.*). Ms. Howard was already taking multiple medications to treat her various disorders, including insulin and metformin for diabetes, methotrexate for pain, losartan and quinapril for high blood pressure, and the psychotropic medications lorazepam, Vyvanse, Ritalin, and sertraline (R. 453). She was also taking the pain medication Tramadol, which Dr. Richman noted was not helpful for Ms. Howard's complaints of worsening pain in her hands and neck (R. 524, 527). Dr. Richman diagnosed her with vasculitis, inflammatory arthritis, and the kidney disease IgA nephropathy (R. 528).

Ms. Howard again complained of neck pain on October 2012 to Dr. Grant Sieversten, who had treated her earlier for diabetes. He noted that Ms. Howard stated that her neck pain had persisted for three to five years and that neither steroids nor pain medication had helped (R. 417). Dr. Sieversten prescribed Norco for pain and ordered a cervical MRI (R. 420). Ms. Howard did not follow through with the MRI referral. Instead, she began treatment on February 6, 2013 with Dr. Brian O'Leary, complaining of burning and pain in her neck and upper back that she claimed had begun 10 years before (R. 709). Ms. Howard stated that her pain started early in the morning and worsened throughout the day (*Id.*). Dr. O'Leary's examination showed diffuse neck pain and upper-back muscle strain, for which he prescribed a course of physical therapy (R. 712). Ms. Howard reported some improvement with therapy by February 22, though she also been had given prednisone during the interim to treat her inflammatory arthritis (R. 700).

Shortly thereafter, Ms. Howard reported that therapy did not bring her pain under control. By March 11, 2013, she described her pain as six on a scale of one-to-ten, and her therapist noted that she was making only limited progress (R. 1310). Dr. O'Leary therefore added the anti-inflammatory medication Arthrotec (diclofenac) to her Norco pain medication on March 27 due to

3

worsening pain in Ms. Howard's right shoulder (R. 1285). That, too, failed to provide significant pain relief, as Dr. O'Leary stated on April 3, 2013 that Ms. Howard showed little improvement in the pain on her right side and had "significant worsening" of pain in the left side of her neck, upper chest, and shoulder (R. 1270). Ms. Howard reported that the diclofenac helped, though it caused nausea, dizziness, and fatigue that required her to sleep "for hours" after taking each dose (*Id.*). Pain was again present on April 17, when Ms. Howard admitted to Dr. O'Leary that she was doing her therapy exercises at home instead of in the therapy clinic (R. 674). She told Dr. O'Leary that she could only work three days a week because pain and fatigue left her exhausted and struggling to perform her daily activities (R. 674-76). As a result, Dr. O'Leary reduced her therapy sessions to one every two weeks due to her "poor to fair tolerance" of them, particularly the exercises designed to treat her cervical spine (R. 1239).

Ms. Howard's physical therapy came to a halt on April 27, 2013, when she suffered a myocardial infarction (R. 460, 1231). She underwent a cardiac catheterization and was released from the hospital two days later with a prescribed program for cardiac rehabilitation (R. 473, 753-64). Ms. Howard quickly resumed treatment for her neck and joint pain when she saw Dr. Richman again on May 2, 2013. She described the pain in her hands and feet as stable, but continued to complain of cervical pain and numbness in her extremities (R. 1215). Dr. Richman noted that Ms. Howard's inflammatory markers were elevated but stable and that her neck discomfort was probably secondary to osteoarthritis (R. 1218). Dr. Richman diagnosed mild degenerative disc disease at C4-C5 and C5-C6 (*Id.*). Ms. Howard was taking Norco, diclofenac, and methocarbamol to relieve her neck pain. As noted, she had complained earlier that diclofenac made her dizzy and nauseated. Her concerns about the side effects of this combination of pain medications became more serious by June 31, 2013. She told Dr. O'Leary at that time that the medications made her

4

so sleepy that she wanted to simplify her medication protocol even if that meant she had to tolerate her current pain level of eight out of 10 (R. 1193). Nevertheless, no medication changes were made by Ms. Howard's next appointment with Dr. O'Leary on July 23, 2013 (R. 1183-84). At that time, Dr. O'Leary wrote that Ms. Howard's neck pain was present every day and that it was made worse by stress, sitting at a computer keyboard, holding a book, and by driving. Looking from side to side exacerbated her pain, which radiated into her upper extremities when she read and into her lower extremities when she sat (R. 1183).

On August 16, 2013, consulting physician, Dr. Kimberly Middleton, examined Ms. Howard for the Social Security Administration ("SSA"). She noted that Ms. Howard was currently taking atorvastatin, diclofenac, Effient, folic acid, Lantus, losartan, metformin, methocarbamol, methotrexate, Ritalin, Norco, Metoprolol, Novolog, and prednisone (R. 718). No joint swelling was present, and all of Ms. Howard's joints, other than her neck and bilateral shoulders, showed a full range of motion (R. 719-20). Dr. Middleton diagnosed Ms. Howard with IgA nephropathy, vasculitis, type-2 diabetes, myocardial infarction, cervicalgia, ADHD, post-traumatic stress disorder ("PTSD"), and depression (R. 720).

On September 24, 2013, Ms. Howard was also examined by psychologist, Dr. Kathryn Wheeler. Ms. Howard told Dr. Wheeler that her sleep had become increasingly disrupted; she frequently sleeps only a few hours each night, but often sleeps up to six hours during the day after taking her pain medication (R. 723). She described her activities of daily living ("ADL") as limited. Ms. Howard can only do one load of laundry per day, does little housework, and cooks only simple meals that involve little preparation (R. 723-24). Even using her hands to work on a computer causes pain (R. 724). Ms. Howard described her mood as increasingly "crabbier" with flashbacks of childhood trauma (Id.). Dr. Wheeler did not note any obvious cognitive difficulties,

5

but described Ms. Howard as restless, tearful, and visibly dysphoric (*Id.*). The psychologist diagnosed depression, PTSD, and ADHD (R. 726).

Ms. Howard reaffirmed her increased irritability during a September 10, 2013 visit with Dr. O'Leary (R. 1152). She ascribed it to her neck and shoulder pain, which she said feels "like a torch" after sitting for only 10 to 15 minutes (*Id.*). By October 11, Ms. Howard rated her pain as eight out of 10 without medication, and five out of 10 with Norco, diclofenac, and methocarbamol (R. 1122). She complained to Dr. O'Leary that it was difficult even to hold up her head (*Id.*). The next month on November 11, Dr. O'Leary noted that her ongoing pain was "clearly made worse with activity" (R. 1102). That included Ms. Howard's cardiac rehab program, which she had continued to follow since her myocardial infarction (R. 1102). Ms. Howard complained that the rehab exercises exacerbated her neck pain, and her cardiologist stated on October 31, 2013 that her progress had been "limited by neck/spine pain" (R. 1106). Dr. O'Leary therefore referred Ms. Howard to rheumatologist, Dr. Michael Sams, who examined her on November 12, 2013. Like Dr. Richman, Dr. Sams diagnosed relatively benign conditions. He determined that Ms. Howard's vasculitis, and inflammatory arthritis were stable, with only very mild degenerative disc disease at C4-C5 and C5-C6 (R. 1086-89). Dr. Sams also agreed with Dr. Richman that Ms. Howard's neck pain was secondary to osteoarthritis (R. 1090).

Nevertheless, Ms. Howard continued to characterize her pain as significant. She began a new course of physical therapy on January 22, 2014, when Ms. Howard told her therapist that her neck hurt both at rest and with movement (R. 1051). She described the pain at rest as eight out of 10, with an average rating of five to six out of 10 (*Id.*). Ms. Howard reported that extending her right shoulder caused sharp stabbing pain (*Id.*). In February 2014, Dr. Richman added the anti-rheumatic medication Plaquenil and a Voltaren (diclofenac) patch to treat Ms. Howard's

osteoarthritis and noted that she was also taking 17 other medications: Novolog, Lantus, methotrexate, methylphenidate, prescription vitamin D, folic acid and potassium chloride, Norco, methocarbamol, furosemide, Plavix, Lopressor, atorvastatin, Wellbutrin, metformin, losartan, and sertraline (R. 1035-36). The new medications that Dr. O'Leary prescribed did not help, however, and Ms. Howard complained of increased pain on March 3, 2014. She stated that she was experiencing a baseline pain level of six to seven out of 10 about 60 percent of the time, with the remaining 40 percent at 10 out of 10 (R. 1030). Sitting more than 10 minutes created pain, and sitting for more than one hour triggered her baseline level of discomfort (*Id.*). Physical therapy increased, rather than diminished, her pain (*Id.*). As before, Ms. Howard complained that if she took Norco to relieve her condition, she fell asleep for up to six hours (*Id.*). Dr. O'Leary concluded that Ms. Howard was "very posture sensitive" (R. 1032). He repeated that finding on March 31, 2014 (R. 1003, "I do think that there may be ergonomic issues (long car commute, sitting at computer) that contribute to her current symptoms"). Dr. O'Leary also noted that her pain levels had not improved with therapy, though no neck pathology was present to prevent Ms. Howard from working (R. 1001, 1003).

Dr. O'Leary referred Ms. Howard to a new rheumatologist, Dr. Barbara Heller, whom Ms. Howard saw on March 11, 2014. She told Dr. Heller that her head felt heavy and became hard to hold up over time (R. 1015). Working at a computer aggravated her condition, and lying down improved it (*Id*). Like other experts, Dr. Heller noted only mild degenerative changes in Ms. Howard's cervical spine and diagnosed her with vasculitis and inflammatory arthritis (R. 1018). Dr. Heller ordered an MRI of Ms. Howard's cervical spine, which showed mild degenerative changes from C3-C4 to C6-C7 and spondylosis (R. 993-94). Ms. Howard was not working at the time of her consultations with Dr. Heller, but he opined that she could return to work if ergonomic

adjustments were made to her workstation. The doctor therefore wrote out ergonomic recommendations (which are not included in the record) to Ms. Howard's employer so that she could transition back to working full time (*Id.*). The record is unclear on the dates involved, but Ms. Howard went back to work at some time after that appointment on March 11, 2014. However, during a May 12, 2014 appointment, she told Dr. Heller that she was subsequently fired from her position (R. 1363).

Few medical records concerning Ms. Howard's neck and joint pain are present after she lost her job. She told Dr. O'Leary on June 10, 2014 that her pain levels had increased. Ms. Howard described "stabbing" pain in her left shoulder and stated that pain could be generated even by holding a book. She told Dr. O'Leary that she spent most of her time lying down (R. 1353). The last medical entry shows that Ms. Howard sought emergency treatment for right knee pain on March 17, 2015 at the Presence St. Joseph Hospital (R. 386). No abnormality was noted. Her neck showed a full range of motion, and Ms. Howard was released without medication (R. 386-87).

**B.**

The ALJ held a hearing on February 9, 2015 (R. 43-94). Ms. Howard testified that she was born on August 3, 1966 and lived at home with her husband and teenage son (R. 52-53). She left high school early in her junior year to help support her family, but subsequently earned a GED degree (R. 55). During the past 15 years, Ms. Howard had worked, first as a file clerk and later as a telephone customer service representative, for health care providers such as hospitals. Her most recent work was for Presence Health, where Ms. Howard provided phone support for her employer concerning Medicare billing from insurance companies (R. 56-58). Her work involved large amounts of typing (R. 58). Ms. Howard's attorney told the ALJ that her employer put Ms. Howard

8

on disability leave on March 27, 2013, and that she was terminated one year later in March 2014 (R. 48). Ms. Howard explained that, for two years before she was placed on leave, she had not been able to finish a full work week because of her pain and fatigue (R. 72). If she managed to complete five days of work one week, she would be absent from work the following week and even the Monday after that (R. 73).

Ms. Howard briefly described her medical issues related to high blood pressure, diabetes, coronary artery disease, vasculitis, and nephropathy (R. 59-61). Her primary focus, however, was on the pain in her neck, shoulders, and back. Ms. Howard told the ALJ that she had stopped working due to cervical pain that made her head feel "like a stick that's ready to just bust" (R. 59). The pain radiated from her forehead through the shoulders and her back (*Id.*). Movement frequently worsened Ms. Howard's discomfort. She explained, for example, that she was unable to do the prescribed cardiac rehab exercises three days a week after her heart attack because they increased her neck pain (R. 59, 78). She had to reduce the rehab to twice a week and eventually to once a week in order to tolerate its effect on her neck (R. 78). Ms. Howard also stated that stress increased her pain, and she endorsed a December 12, 2013 note from Dr. O'Leary observing that she had "much less neck pain" after she stopped working (R. 59, 80, 1082). During the time she was employed, Ms. Howard often needed to lie down in her car during lunch to relieve the pain (R. 59).

Ms. Howard told the ALJ that she had a limited ability to carry out her activities of daily living ("ADL"). She could stand for only five or six minutes before needing to sit down, and could walk for only three or four minutes (R. 61). All forms of lifting, including a carton of milk, create discomfort (R. 61-62). Working at a keyboard, holding a book, or putting her arms on a table for a period of time increase her pain (R. 75-76). Ms. Howard found cleaning to be very difficult, and

thus did only "a little bit at a time" (R. 65). She testified that she must choose between doing the laundry or washing dishes because doing both is too much (R. 66, "So my house pretty much is a pigsty"). Even then, her husband must load the dishwasher for her (R. 67). She buys only a few items when she goes shopping because bringing things into the house is too strenuous for her (R. 67). Lying down helps alleviate her pain, and Ms. Howard noted that she often needs to rest at least three or four times a day for about 40 to 60 minutes each time (R. 77). Ms. Howard told the ALJ that her ADLs were even more restricted when she was working. The increased pain created by stress limited her to loading the dishwasher only once a week, and she only put clothes in the washing machine when it was crucial to do so, leaving it to her husband to dry them (R. 80).

Ms. Howard particularly complained to the ALJ about sleepiness and fatigue caused by her pain medication. She explained that, even though she told Dr. O'Leary in April 2013 that she wanted to take fewer pain medications due to sleepiness, she found that her increased pain left her exhausted and that she went back on the pain medication despite the sleepiness it caused (R. 75). Exertion itself created significant fatigue that required her to sleep (R. 66). In addition, Ms. Howard testified that, when she takes medication to control the pain caused by exertion, she falls asleep 90 percent of the time (Id.).

In addition to her testimony at the hearing, Ms. Howard also submitted written function statements to the SSA on July 10, 2013 and April 18, 2014 that reiterated many of the limitations on her ADLs that she described to the ALJ (R. 289-96, 315-22). Importantly, her husband also provided written statements on July 16, 2013 and April 24, 2014 (R. 278-85, 327-34). He described his wife's daily activities as very limited. Mr. Howard stated, for example, that she prepares only sandwiches and frozen food, does dishes twice a week, and engages in physical activities like gardening and swimming only on rare occasions for a limited period of time (R. 279-

80, 282). Mr. Howard suggested that her ability to carry out her ordinary ADLs had become more limited in time. The 2013 function report states that Ms. Howard could prepare food three to four times a week; by 2014 she could only do so once or twice a week (R. 280, 329). Mr. Howard agreed with his wife that she has difficulty working at a keyboard or in sitting, standing, or walking for prolonged periods (R. 278, 327, 332).

## C.

On March 22, 2015, the ALJ issued a written decision denying Ms. Howard's claim for benefits. At Step One of the sequential evaluation, the ALJ found that Ms. Howard had not engaged in substantial gainful activity since her alleged onset date of March 25, 2013 (R. 25). The ALJ concluded at Step Two that her severe impairments include cervical spine narrowing and spondylosis, vasculitis, myocardial infarction, and coronary artery disease (*Id.*). He further found that nephropathy, diabetes, hypertension, obesity, attention deficit hyperactivity disorder ("ADHD"), anxiety, depression, and post-traumatic stress disorder ("PTSD") are also not severe disorders (R. 26). The ALJ concluded that inflammatory arthritis is not a medically-determinable impairment because the record did not show that Ms. Howard had been diagnosed with that condition (*Id.*).[3] He then found at Step Three that none of Ms. Howard's severe impairments meet or medically equal a listed impairment, either singly or in combination (R. 28-30).

The ALJ considered various opinions given by medical experts. He assigned little weight to the reports of the state-agency physicians Dr. Marion Panepinto and Dr. Richard Smith, both of which found that Ms. Howard suffered from the severe impairments of nephrotic syndrome and diabetes (R. 26, 88, 115). The ALJ stated that the medical record did not support the severity of nephropathy and did not show that Ms. Howard experienced any abnormal effects from her

---

[3] On this point, since this case requires remand on other grounds, the ALJ should consider that Dr. Richman stated on May 2, 2013 that inflammatory arthritis is Ms. Howard's "primary diagnosis" (R. 854).

diabetes (R. 26). The state-agency doctors also found that hypertension was a severe disorder, but the ALJ rejected it as a medical impairment without referencing the state-agency physicians (*Id.*). He then rejected the findings of state-agency psychologists, Dr. Kirk Boyenga and Dr. Michele Womantree, that Ms. Howard's anxiety disorder, ADHD, and affective disorder are severe impairments that moderately restricted Ms. Howard's ability to interact with the public, complete a normal workday, and maintain concentration for extended periods (R. 26-27, 103-05, 115-16).

The ALJ also assigned little weight to the experts' conclusion that Ms. Howard would be able to carry out light work as that exertional level is defined in 20 C.F.R. § 404.1567(b) as long as she only has moderate exposure to extreme cold, heat, and hazards such as machinery or heights (R. 35, 119). The ALJ reasoned that this assessment of Ms. Howard's residual function capacity ("RFC") was inconsistent with the record. He also considered a statement of Ms. Howard' treating physician, Dr. Brian O'Leary. Dr. O'Leary commented in an April 17, 2013 treatment note that Ms. Howard told him that she could not complete a full work week and that he agreed that it was reasonable for her to apply for disability benefits (R. 1258). The ALJ rejected that statement by claiming that the record did not support it and that the issue of whether a claimant is unable to work is reserved to the Commissioner (R. 35).

Because the ALJ's decision was issued prior to the implementation of Social Security Ruling ("SSR") 16-3p, the ALJ evaluated Ms. Howard's allegations concerning the severity and frequency of her symptoms by assessing the credibility of her testimony and written statements under SSR 96-7p.[4] The ALJ determined that Ms. Howard's statements were "not credible to the

---

[4] SSR 16-3p went into effect on March 16, 2016, superseding SSR 96-7p and eliminating its use of the term "credibility" from the evaluation of a claimant's statements concerning the frequency and severity of his or her impairment-related symptoms. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). Although SSR 16-3p post-dates the ALJ's May 22, 2015 decision in this case, its application is appropriate because SSR 16-3p constitutes a clarification of, rather than a change to, existing law. *Potysman v. Colvin*, 218 F. Supp.3d 782, 787 n.1 (N.D. Ind. 2016).

extent they are inconsistent with the residual functional capacity assessment" (R. 33). He supported his finding by noting that Ms. Howard had shown a willingness to work by receiving unemployment benefits in 2014 and by engaging in ADLs that the ALJ found to be greater than would be expected from a person who is disabled (R. 34). The ALJ also reasoned that the objective medical record showed relatively mild limitations, that Ms. Howard had received only conservative treatment, and that her symptoms had improved with medication (R. 33-34).

Based on these findings, the ALJ determined that Ms. Howard has the RFC to carry out a full range of sedentary work as described in 20 C.F.R. § 404.1567(a) (R. 30). He further determined that non-exertional restrictions were not necessary to address her severe physical impairments or her non-severe mental impairments. Based on the testimony of a vocational expert, the ALJ then found at Step Four that Ms. Howard is capable of performing her past relevant work as a billing clerk (R. 36). Therefore, without moving to Step Five, the ALJ concluded that Ms. Howard had not been disabled from her alleged onset date of March 25, 2013 through the decision date of May 22, 2015 (*Id.*).

### III.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal quotations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's

ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Howard argues that the ALJ made three errors that require remand. *First*, she claims that the ALJ incorrectly found that her statements concerning the frequency and severity of her symptoms were not credible. *Second*, she contends that the ALJ gave great weight to the written statements of her husband without considering all that he said. *Third*, Ms. Howard argues that the ALJ did not sufficiently explain why he gave little weight to the opinion of treating physician Dr. O'Leary that she was unable to work. Because we find that the ALJ failed to properly analyze both Ms. Howard's and Mr. Howard's statements about her symptoms, we reverse on those grounds and remand.

### A.

A reviewing court may overturn a credibility determination if the ALJ fails to justify his conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning that it lacks explanation or support."). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of her symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate her condition; and functional restrictions that result from, or are used to treat, the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between his or her statements and the record. *See Cullinan*, 878 F.3d at 603 ("A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence.") (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)); *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an

analysis of the SSR 96-7p, now the SSR 16-3p, factors as part of a logical bridge for the credibility analysis).

The ALJ addressed a number of these factors and concluded that Ms. Howard's statements about her symptoms were not credible "to the extent they are inconsistent with the residual functional capacity assessment" of sedentary work (R. 33). For the reasons set forth below, the ALJ failed to adequately support that conclusion.

1.

The ALJ began by noting that two sources of medical evidence fail to show significant physical abnormalities that support Ms. Howard's claim that she experiences severe pain. *See* SSR 16-3p (stating that "objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms). The first is an April 7, 2014 statement by Dr. Richman that Ms. Howard was bilaterally free of any impingement and had normal neurological findings (R. 34, 994). Without further discussion, however, the ALJ failed to explain why the absence of such abnormalities undercuts Ms. Howard's testimony. The record is clear that Ms. Howard's pain is primarily related to two of the severe impairments that the ALJ identified at Step Two, vasculitis and problems with her cervical spine (R. 25). The ALJ never explained what the absence of an impingement or a neurological problem has to do with either of these conditions. Vasculitis is an inflammatory condition, not a neuromuscular disorder involving an impingement. *See* https://www.mayoclinic.org/diseases-conditions/vasculitis/symptoms-causes/syc-2036345 ("Vasculitis is inflammation of your blood vessels.") (last visited Nov. 28, 2018). Dr. Richman herself cast doubt on any relation between vasculitis and a neurological problem (R. 508, "From a [r]heumatology standpoint, IgA vasculitis rarely affects the CNS

[central nervous system"]). As for Ms. Howard's cervical condition, the ALJ drew no link between Dr. Richman's note and Ms. Howard's neck pain.

The ALJ was on firmer ground by citing a March 25, 2014 MRI of the cervical spine that showed only mild degenerative disc narrowing and spondylosis at the C3-C4, C4-C5, C5-C6, and C6-C7 levels (R. 993). The ALJ seems to have assumed that these relatively benign findings spoke for themselves, as he did not discuss why the MRI undermined Ms. Howard's testimony. He could not leave it at that, however, because a claimant's "testimony cannot be disregarded simply because it is not corroborated by objective medical evidence." *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015). Pain is frequently hard to diagnose, and courts have repeatedly cautioned adjudicators against making unwarranted inferences based on non-definitive medical studies. *See, e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing cases). The ALJ should have considered that Dr. O'Leary and Dr. Richman were aware of the cervical MRI results the ALJ cited, but did not find that a basis to question the severity of Ms. Howard's reported pain. Instead, they continued to prescribe multiple medications like methotrexate (an injectable treatment for arthritic pain), diclofenac (a non-steroidal anti-inflammatory), Plaquenil (an anti-arthritic), methocarbamol (a central nervous system depressant), Tramadol (a narcotic pain medication), and Norco (another narcotic) to treat her condition. The fact that Ms. Howard's physicians credited her complaints despite the lack of definitive medical tests should have given the ALJ pause before citing the MRI to discount her testimony. *See Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018) (faulting an ALJ for citing normal tests without noting that the claimant's physicians found no contradiction between the tests and the claimant's pain allegations).

When the objective medical evidence does not fully confirm a claimant's allegations, an ALJ must consider other factors such as the claimant's ADLs. *See Israel v. Colvin*, 840 F.3d 432, 440 (7th Cir. 2016); *Clifford v. Astrue*, 227 F.3d 863, 871 (7th Cir. 2000). The ALJ followed this directive, stating in broad terms that Ms. Howard testified that she does laundry, cooks, cares for the family's pets, shops, cleans, and gardens. (R. 34). He concluded that Ms. Howard's activities contradicted her alleged symptoms because they exceeded the exertional capacity that he expected from a person as restricted as she claimed to be (*Id*).

However, the ALJ appears to have simply cited the labels attached to Ms. Howard's various activities without considering the evidence concerning the level of exertion they required. For example, while Ms. Howard testified that she made dinner for her family (R. 66), she also stated in her April 18, 2014 written function report that doing so involved only 30 minutes preparing frozen meals, sandwiches, cereal, or oatmeal (R. 317). The ALJ overlooked what Ms. Howard said in her written statement, thereby failing to account for the minimal nature of her food preparation. Similarly, the ALJ noted that Ms. Howard testified that she had recently been "spring cleaning" (R. 34), without citing to Ms. Howard's testimony that she was only "trying" to clean some items like cabinets, and her condition limited her efforts so much that her house remained "a pigsty" (R. 65-66). Treating physician, Dr. O'Leary, echoed this testimony by recording in an April 17, 2013 treatment note that Ms. Howard "struggles to maintain her house" (R. 1256). As for pets, Ms. Howard stated that she does almost nothing. She opened the back door for the dog, while her husband took care of the family's two cats (R. 69, 316). Ms. Howard loaded the dishwasher once or twice a week, tried to do laundry three times a week, and needed help from her son for both activities (R. 317). Like her cleaning, Ms. Howard characterized her laundry

efforts as largely ineffective; dirty laundry was "piled high" in the hallway to be washed only when necessary (R. 80).

Evidence the ALJ failed to address suggests that Ms. Howard was far more limited in her daily activities than the ALJ said she was, not only in what those activities involve but also in the effect they have on her. As discussed below, Ms. Howard stated that she frequently suffered from fatigue and sleepiness. Even her limited daily activities made her tired, and doing multiple loads of laundry in one day left her "wiped out" (R. 66). Moreover, Ms. Howard made clear that she was able to do fewer daily activities when she was working because stress makes her condition worse – a complaint that Dr. O'Leary included in a July 23, 2013 note (R. 75, 1183). The ALJ overlooked almost everything that Ms. Howard said about the limitations on her ability to engage in daily activities and the fatigue they trigger for her. An ALJ is not required to cite to every item of evidence in the record, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008), but he cannot cherry-pick from the record by ignoring evidence that runs counter to a finding that the claimant is not disabled. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Having done so here, the ALJ failed to build a logical bridge between Ms. Howard's ADLs and his conclusion that they are not as limited as he thought they should have be if she suffers from serious pain.

### 3.

The ALJ further discounted Ms. Howard's testimony about her pain and limitations because he deemed it inconsistent with statements that she had previously made to her doctors (R. 34). The ALJ was particularly concerned with Ms. Howard's description of her pain, which she described as frequently severe despite the many medications she takes to treat it. The ALJ stated that this testimony was contradicted by Ms. Howard's earlier comments to Dr. Richman and consulting physician, Dr. Middleton, that methotrexate was effective in controlling her pain (R.

18

717, 810).  It is true that Ms. Howard told these doctors (as well as the ALJ) that methotrexate helps to alleviate her discomfort.  But she never claimed that it controls all of her pain, or that pain is non-problematic as the ALJ implied.  The record shows that Ms. Howard continued to be prescribed other pain medications that she took at various times in combination with methotrexate, including diclofenac, Norco, Tramadol, Plaquenil, and methocarbamol (R. 665-66).  The fact that methotrexate may be effective for some of Ms. Howard's pain does not mean that all of her pain is under control.  Before drawing a contrary conclusion, the ALJ should have addressed why Ms. Howard's doctors found it was appropriate to continue prescribing multiple pain medications in addition to methotrexate.  *See Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) (stating that "the fact that physicians willingly prescribed drugs . . . indicated that they believed the claimant's symptoms were real").

Part of the problem with the ALJ's consideration of this issue is that he never clearly identified what doctors sought to treat by prescribing methotrexate to Ms. Howard.  She described two basic sources of distress: neck pain, which Dr. O'Leary said was "clearly her most significant problem," and pain in her joints that stemmed from vasculitis (R. 712).  The ALJ seems to have assumed that methotrexate treated all of Ms. Howard's pain.  The record suggests otherwise.  Dr. Richman stated on May 2, 2013, that she prescribed methotrexate for vasculitis (R. 508).  The doctor then made a separate treatment entry for Ms. Howard's neck pain and said that she would "defer pain management [of that] to [the] primary care provider.  Primary care provider could consider pain clinic referral if needed" for neck pain (*Id.*).  That implies that Dr. Richman considered the treatment of Ms. Howard's neck pain to be distinct from the methotrexate for her vasculitis.  Without distinguishing between Ms. Howard's pain treatment more carefully, the ALJ

had no ground for citing Ms. Howard's remarks about methotrexate to find an inconsistency in all of her pain allegations.

The ALJ also criticized Ms. Howard's testimony about her pain because she told Dr. Richman on February 15, 2013 that her vasculitis had been "stable" (R. 515). That, too, fails to demonstrate any inconsistency in Ms. Howard's testimony. The fact that a physician describes a claimant's symptoms as "stable" does not indicate that that her condition is less serious than she alleges because "a person can have a condition that is both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008) (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)). *See also Barnes v. Colvin*, 80 F. Supup.3d 881, 889 (N.D. Ill. 2015) ("'Stable' only signifies that Barnes' condition remained the same over a period of time. It does not address the level of what his condition was. Plaintiff could have been 'stable' and non-functional, or 'stable' and fully functional").

In addition, Ms. Howard also suffers from inflammatory arthritis, which Dr. Richman concluded was a manifestation of her vasculitis (R. 508, 545). Rheumatologist, Dr. Brinda Joshi, in turn, described Ms. Howard's inflammatory arthritis as "intermittent," indicating that the symptoms associated with it fluctuated over time (R. 535). Dr. Richman's treatment notes support that finding. Only five months before the February 2013 entry that the ALJ cited to claim that Ms. Howard's condition was stable, Dr. Richman said that Ms. Howard was experiencing worsening joint pain that was not helped by medication (R. 524). The ALJ overlooked that finding. Equally important, vasculitis and inflammatory arthritis were not the only causes of Ms. Howard's pain. The record clearly shows that her neck discomfort continued even during the time when Dr. Richman said her vasculitis was stable. On March 27, 2013, Dr. O'Leary stated that Ms. Howard had been bothered "for weeks" by neck and shoulder pain that she characterized at a level of eight

out of 10 (R. 1283). Thus, whether Ms. Howard's vasculitis was stable or not, the record shows that she continued to complain to her doctors of severe pain.

## 4.

The ALJ doubted Ms. Howard's testimony that she frequently needs to lie down during the day because of pain. The ALJ claimed that Ms. Howard did not tell her doctors that pain required her to lie down that often (R. 34). To the contrary, Dr. O'Leary noted on June 10, 2014 that she was experiencing increased pain and "spends most of her time lying down" (R. 1353). The ALJ also failed to address evidence supporting Ms. Howard's testimony that she lies down for up to four hours a day because of both pain and extreme sleepiness brought on by the medications she takes to treat it. Dr. O'Leary noted on June 21, 2013 that Ms. Howard "finds that this combination [of pain medications] makes her quite sleepy and she can sleep a lot" (R. 1193). Ms. Howard made the same claim to consulting psychologist Dr. Kathryn Wheeler, stating that she slept up to six daytime hours after taking pain medication (R. 724). Indeed, Ms. Howard told the ALJ that sleepiness was so problematic for her that she had been willing at one point to give up one of her pain medications even if doing so increased her pain – which is consistent with what Dr. O'Leary recorded in a treatment note (R. 74-75, 723). The ALJ never considered Ms. Howard's testimony about the somnolence caused by her medications. *See Brown v. Barnhart*, 298 F. Supp.2d 773, 795-96 (E.D. Wis. 2004) ("Courts have condemned ALJs for failing to consider such evidence [of side effects] when it was potentially relevant to the claimant's ability to work.").

## 5.

The ALJ also discounted Ms. Howard's testimony because she received conservative care and no doctor recommended surgery for her neck problem (R. 34). It is far from clear, however, that Ms. Howard's treatment can be accurately characterized as conservative. She was continually

prescribed multiple powerful pain medications, including narcotics, a steroid, anti-inflammatories, anti-arthritics, and a central nervous system depressant. These medications were frequently taken in combination, not only with one another, but also with the astonishing array of other prescriptions she was given to treat her various conditions. As noted earlier, the record suggests that Ms. Howard was given up to 19 different medications and prescription-strength supplements at one point (R. 1035-36, 1051). Without more explanation, such an extensive use of medication over an extended time period cannot simply be labeled as "conservative care." *See Lapeirre-Gutt v. Astrue*, 382 Fed.Appx. 662, 664 (7th Cir. 2010); *Banks v. Berryhill*, No. 16 C 8330, 2017 WL 4150618, at *7 (N.D. Ill. Sept. 19, 2017) ("The use of strong pain medication can also run counter to an ALJ's conclusion that a claimant only received conservative care."); *Cunningham v. Colvin*, No. 14 C 420, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) (noting that courts frequently question whether the use of narcotic pain medicine is equivalent to conservative care) (citing cases).

What's more, if Ms. Howard's treatment were to be deemed conservative, that does not automatically mean that she exaggerated her symptoms. A claimant does not have to undergo the most extreme form of treatment in order for her testimony to be accepted. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) (addressing mental disorders). The ALJ should have considered the degree to which Ms. Howard's treatment alleviated her pain even if it was conservative. *See Dyer v. Berryhill*, 237 F. Supp.3d 772, 776 (N.D. Ill. 2017). She said that it did not, or at least that it did not consistently do so. There is evidence in the record that supports that claim. On March 11, 2013, for example, Ms. Howard described her pain level as six out of 10 (R. 1310). On October 11, 2013, it was eight out of 10 without medication, and five out of 10 with the prescriptions that rendered her sleepy (R. 1122). By March 2, 2014, she told Dr. O'Leary that her "baseline" neck

22

and shoulder pain was six to seven out of 10 with medication, and 10 out of 10 at its worst (R. 1030). The pain was even worse on June 10, 2014 (R. 1353, "She finds that she is developing increase[s] in her pain"). Moreover, conservative treatment like physical therapy was clearly ineffective. Ms. Howard's therapist noted that she had "poor to fair tolerance to manual therapy," and Dr. O'Leary stated that therapy had not helped her (R. 1001, 1239). In fact, Dr. O'Leary suggested it made her condition worse (R. 674, "She continues to have headaches that seem to be made worse with PT"). Without addressing the effectiveness of the treatments that Ms. Howard received, the ALJ could not conclude that she mischaracterized her symptoms because surgery was never recommended.

**6.**

Finally, the ALJ reasoned that Ms. Howard's receipt of unemployment benefits in 2014 indicated that "she was ready, willing, and able to work" (R. 34). Applying for or receiving unemployment benefits can suggest that a claimant's symptoms are less serious than she claims. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). No bright line exists, though, and an ALJ must take a nuanced approach that accounts for the evidence in each case. *Scrogham*, 765 F.3d at 699 (calling for "significant care and circumspection").

The evidence in this case present a murky outline of events that the ALJ never attempted to clarify. Ms. Howard's payment records show that she received one check for unemployment benefits in the amount of $333.00 in the second quarter of 2014 (R. 240-41). The ALJ questioned her about this payment, but Ms. Howard emphatically testified that she did not receive such a check and never applied for unemployment benefits (R. 53). The record is not entirely clear, but Ms. Howard was unemployed during the early months of 2014 and received disability payments from her employer during the first quarter (R. 240-41). She told Dr. Richman that she had gone

back to work at some point during that period, and Ms. Howard's attorney stated at the hearing that she was fired at some point in March 2014 (R. 48, 1363). Ms. Howard told the ALJ that Emerald County, Illinois officials told her at some unspecified point that she did not qualify for unemployment benefits because she was on disability leave (R. 53). Her attorney suggested that the $333.00 check might have been for long-term disability benefits and told the ALJ that he would produce additional documents, though the record does not reflect that he did so (R. 54). The ALJ never addressed what she and her attorney said on the unemployment issue, and thus failed to apply the "care and circumspection" that the ALJ was obligated to use to address this topic. *Scrogham v. Colvin*, 765 F.3d 685, 699.

## B.

Ms. Howard also challenges the ALJ's evaluation of statements made by her husband, who submitted two written function reports on July 16, 2013 and April 24, 2014 (R. 278-85, 327-34). The ALJ summarily stated that Mr. Howard wrote that his wife "watches television, cooks, cleans, does laundry, does dishes, drives, shops, and swims once a week" (R. 35). The ALJ gave Mr. Howard's statements great weight because he thought they identified Ms. Howard's "true capabilities" (*Id.*).[5]

We agree that the ALJ is required to reconsider what Mr. Howard stated in his report. But, as with Ms. Howard's testimony, the ALJ overlooked multiple limitations that Mr. Howard included in his statements that would confirm, rather than contradict, his wife's testimony. He wrote, for example, that Ms. Howard only prepares sandwiches and frozen food; she does dishes once or twice a week; and Mr. Howard cares for the cats by himself (R. 279-80). The ALJ noted that Ms. Howard gardens and swims, but Mr. Howard pointed out that she gardens "very rarely"

---

[5] The ALJ also credited Mr. Howard's written statements that his wife has no limitation in her ability to pay attention for indefinite periods of time (R. 35). Ms. Howard does not challenge the ALJ's finding on that issue.

and only swims once a week "for a short time" (R. 282). Ms. Howard told the ALJ that she was unable to work at a computer keyboard for a sustained period of time because it created pain (R. 75-76). Her husband agreed (R. 278). He also mirrored Ms. Howard's testimony that she had a limited ability to sit, stand, or walk (R. 327, 332).

By stating that Mr. Howard had identified his wife's "true capabilities," the ALJ presumably meant that Mr. Howard had agreed with the ALJ's own conclusion that she had the exertional capacity to carry out sedentary work. Yet, almost everything that Mr. Howard stated runs counter to that finding. That requires remand so that the ALJ can assess all of what Ms. Howard's husband said on the issue. *See Moore v. Colvin*, 743 F.3d 1119, 1123 (7th Cir. 2014) (stating that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it").

## CONCLUSION

For the reasons stated above, we grant Ms. Howard's motion for summary judgment (doc. #19) and deny the Commissioner's motion for summary judgment (doc. #27). We remand the case for further proceedings consistent with this opinion. This case is terminated.[6]

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: December 12, 2018**

---

[6] In light of our decision to remand, we need not address Ms. Howard's remaining claim that the ALJ erred in giving little weight to the opinion of her treating physician Dr. O'Leary. *Eskew v. Astrue*, 462 Fed.Appx. 613, 615 (7th Cir. 2011). That said, on remand, the ALJ should reconsider the proper weight to assign to Dr. O'Leary's opinion. In doing so, the ALJ should keep in mind that "[w]hether a claimant qualifies for benefits is a question of law . . . but a medical opinion that a claimant is unable to work is not an improper legal conclusion." *Lambert*, 896 F.3d at 776 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012)). The ALJ should be mindful that in deciding to assign no weight to a treater's opinion, merely citing the general record does not act as a "gapfiller" for an ALJ's close evaluation of how the record allegedly contradicts the treater's opinion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("That is why the ALJ . . . must build an accurate and logical bridge from the evidence to her conclusion") (internal quotes and citation omitted). *See also Larson v. Colvin*, 26 F. Supp.3d 798, 811 (N.D. Ill. 2014) ("Just as an expert's *ipse dixit* is not acceptable . . . neither is an ALJ's. That is the whole point of the logical bridge requirement.").